UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JUDITH DEJESUS,

                              Plaintiff

                                                    DECISION AND ORDER

-vs-
                                                    06-CV-6044 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                              Defendant.

_____

APPEARANCES

For the Plaintiff:              Alecia A. Elston, Esq.
                                Segar & Sciortino
                                400 Meridian Centre, Suite 320
                                Rochester, New York 14618

For the Defendant:              Terrance P. Flynn, Esq.
                                United States Attorney for the
                                Western District of New York
                                Brian M. McCarthy, Esq.
                                Assistant United States Attorney
                                100 State Street
                                Rochester, New York 14614

INTRODUCTION

    This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits and supplemental security income

("SSI") benefits.  Now before the Court is plaintiff's motion for judgment on the

1

pleadings [#9] and defendant's cross-motion [#11] for the same relief.  For the reasons stated below, defendant's application is denied, plaintiff's application is granted, and this matter is remanded for further administrative proceedings.

PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about February 19, 2004, claiming to be disabled due to carpal tunnel syndrome, diabetes, asthma, and bi-polar disorder. (82)[1].  Plaintiff indicated that she became unable to work on December 2, 2003. (85). Plaintiff stated that she previously worked as an assembler in a factory, where she was required to walk for up to three hours per day, stand for two hours per day, sit for two hours per day, and stoop, kneel, and crouch occasionally. (86).  Plaintiff additionally indicated that she was required to use her hands to write and handle for up to eight hours per day, and indicated that she was also required to lift up to ten pounds frequently, and to lift a maximum of 75 pounds. (*Id.*).  The Commissioner denied the application, finding that plaintiff was capable of performing light work. (82).  A hearing was held before an Administrative Law Judge ("ALJ") on July 13, 2005, after which the ALJ denied benefits. (11-18).  Plaintiff appealed to the Appeals Council, and submitted additional medical evidence. (295-316).  The Appeals Council declined to review the ALJ's determination on November 23, 2005. (4).

MEDICAL EVIDENCE

Marie N. Frankel, M.D. ("Frankel"), examined plaintiff several times between August 2002 and November 2002. (169-76).  Frankel stated on August 1, 2002, that

---

[1]Citations are to the administrative record unless otherwise noted.

plaintiff was complaining of pain in her wrists and forearms that radiated up her arms. (174).  Frankel noted that plaintiff also complained of "numbness when she is driving." (Id.).  Frankel's impression was "overuse syndrome, tendonitis, DeQuervain's Tenosynovitis and possible carpal tunnel syndrome." (176).  Plaintiff remained working at that time, despite her complaints of pain.

On August 28, 2002, Allan Pettee, M.D. ("Pettee"), a neurologist, examined plaintiff, upon a referral from Frankel. (144-46).  Pettee examined plaintiff and performed electrophysiological studies, from which he concluded that plaintiff had "borderline to mild carpal tunnel syndrome on the left," and mild carpal tunnel syndrome on the right. (146).  Pettee prescribed carpal tunnel splints for plaintiff to wear at night, and indicated that he did not think that surgery was required. (Id.).  Pettee further stated that plaintiff would likely require modification of her work procedures to avoid repetitive use of her hands. (Id.).

On September 9, 2002, Frankel reported that plaintiff's nerve conduction studies were "normal." (173).  Frankel indicated, however, that plaintiff's examination was "consistent with DeQuervain's Tenosynovitis and Tendonitis." (Id.).

On October 1, 2002, Frankel reported that plaintiff was complaining of pain and swelling in her hands, although she observed that plaintiff had "full function" in her hands, and that Finkelstein's, Tinel's, and crank and grind tests were negative. (171).  Frankel also noted that plaintiff was complaining of pain in her neck and shoulders, and as a result, Frankel ordered an x-ray of plaintiff's cervical spine. (Id.).  On October 1, 2002, plaintiff obtained x-rays of her wrists and cervical spine. (147-52).  The x-rays were normal.

3

On October 15, 2002, Frankel reported that plaintiff was complaining of pain in her hands "at nighttime only," and was reportedly using a TENS unit at home. (170). Frankel observed that the wrist flexion test, Tinel's test, and Finkelstein's test were all negative.

At Frankel's suggestion, plaintiff attended occupational therapy during September and October 2002. Sue Ann Dunford, OTR CHT ("Dunford"), an occupational therapist, noted that plaintiff was complaining of pain and tightness in her neck and trapezius muscles and pain and swelling in her wrists.  Dunford examined plaintiff on September 11, 2002, and noted a positive Tinel's sign in the right hand, a positive Tinel's and Finkelstein's sign on the left, and edema in both hands. (163-64). Plaintiff complained of being awakened at night by tingling in her hands. (159).  Dunford reported that plaintiff was getting some relief from using a TENS unit. (155) ("TENS is helpful.").  Dunford indicated on October 9, 2002, that plaintiff was having "gradual progress" with therapy. (159).

On November 14, 2002, Frankel reported that she had "nothing else really to offer" plaintiff as far as treatment. (169).  In that regard, Frankel observed that plaintiff's "hand exam, including wrist flexion test, Finkelstein's test, Tinel's sign and crank and grind test" continued to be negative.  Frankel recommended that plaintiff discontinue physical therapy, since plaintiff did not appear to be making progress. (*Id*.).  Frankel also recommended that plaintiff obtain a neurologic exam of her cervical spine, since her "complaints seem[ed] to be in her neck," though she noted that an x-ray of the cervical spine was negative. (*Id*.).

On May 5, 2003, Jeffrey Fink, M.D. ("Fink"), a hand surgeon, examined plaintiff.

4

Plaintiff complained to Fink of "hand numbness and tingling along with right wrist pain." (180). Plaintiff also complained that she was awakening about three times per week with tingling and numbness in her hands, and that she was dropping small objects with her right hand. Fink noted that plaintiff was still working at her factory job at the time, although she was wearing a brace on her right wrist and was limited to lifting 5 pounds. Fink found that plaintiff had "full range of motion in both hands and wrists." However, he reported that Phalen's and Tinel's [were] both positive bilaterally," and that plaintiff had tenderness in her wrists. (180). Fink's diagnosis was "mild left carpal tunnel syndrome, possible mild right carpal tunnel syndrome, right wrist pain with the differential for pain including flexor carpi radialis tendonitis," and he injected a mixture of Xylocaine and betamethasone into plaintiff's right carpal tunnel. (181).

On July 17, 2003, Fink again examined plaintiff, at which time plaintiff indicated that the injection in her right wrist had not helped her symptoms. (179). However, Fink reported that plaintiff's "hand symptoms" had "significantly improved over the last month," apparently due to the fact that plaintiff had stopped working as a machine operator and had begun to work in a clerical position. (Id.). Fink observed that plaintiff had mild tenderness in her right forearm and none in her left forearm. Based upon plaintiff's "beneficial response to her change in work," Fink recommended against surgery, and indicated that plaintiff should continue "in a light duty work position such as her present clerical job." (Id.). Fink further recommended that plaintiff should continue to wear her right splint and lift no greater than 5 pounds.

On November 3, 2003, Carolyn Lee-Mok, M.D. ("Lee-Mok"), plaintiff's primary care provider, issued a report concerning plaintiff's "carpal tunnel syndrome and the

5

confounding issue of diabetes mellitus." (177).  Lee-Mok stated that plaintiff had come

to her on January 23, 2003, with concerns about diabetes, and that she had diagnosed

"mild diabetes," for which she prescribed "diet and exercise."  Lee-Mok also referred

plaintiff to a dietician and diabetic educator.  Lee-Mok reported that she had examined

plaintiff on October 9, 2003, at which time she had "no symptoms suggestive of her

diabetes." (Id.).  Lee-Mok stated that, based upon thyroid testing, it was opinion that

plaintiff's "mild diabetes [was] not the primary cause of her carpal tunnel syndrome."

(178).  Additionally, Lee-Mok indicated that diet and weight loss were the only treatment

that plaintiff needed.

On November 7, 2003, D. Sewall Miller, M.D. ("Miller"), a non-treating,

consultative orthopedic specialist, examined plaintiff.  Miller reported that plaintiff told

him: "My hands are not strong like they used to be.  My neck and shoulders are killing

me." (182).  Miller further reported that plaintiff was then working "at light duty, clerical

work." (Id.).  Miller observed that plaintiff had a full range of motion in her upper

extremities, except for a mild limitation in her shoulders that was "probably anatomic in

nature." (183).  Miller found that plaintiff had tightness in her trapezi, and "mild

tenderness" in both forearms.  Miller also noted that plaintiff had a negative

Finkelstein's test in both wrists, a positive Phalen's test bilaterally with mild tingling in

her fingers, and that she complained of aching wrist pain.  Miller furthermore stated:

> Based on today's examination and evaluation, I feel that the examinee
> has bilateral upper extremity overuse syndrome with the left arm seeming
> to be more affected than the right and consisting of mild carpal tunnel
> syndromes and mild common extensor origin tendinitis.  She also has
> chronic shoulder strains.
>                               ***
> It appears that she has reached maximum medical improvement based

6

on her current treatment but I do not believe she can ever return to her pre-injury work as an assembly worker.  Work restrictions are no lifting above shoulder level, no lifting more than 10 pounds occasionally, and lifting from knee to shoulder level only.  She should not have to carry out rapidly repetitive activities such as would be required in an assembly line type of job.  She has a moderate permanent partial disability due to bilateral upper extremity dysfunction. . . .  Her asthma is virtually asymptomatic.  I do not believe that her asthma nor her mild diabetic state is affecting her current working capacity.

(184).

On December 2, 2003, plaintiff, who as noted above had moved from her assembly-line position to a clerical position, stopped working altogether.  Subsequently, on December 19, 2003, plaintiff began treating with a new primary care physician, Leila Kirdani-Ryan, M.D. ("Kirdani-Ryan").  Plaintiff indicated to Kirdani-Ryan that she was having pain, cramping, and numbness in her hands.  Upon examination, Kirdani-Ryan observed that plaintiff had "slightly decreased grip strength," particularly in her left hand, "slightly decreased interosseous muscle strength," positive Tinel's sign, negative Phalen's sign, and significant muscle spasm in her trapezius, with slightly decreased range of motion in her neck. (208).  Kirdani-Ryan saw plaintiff again on December 23, 2003, because plaintiff was complaining of shortness of breath, at which time the doctor noted that plaintiff's lungs were clear to auscultation with occasional scattered wheeze. (207).  On January 16, 2004, plaintiff told Kirdani-Ryan that she was having trouble sleeping, because of tingling and numbness in her hands and arms, and that she was experiencing increased pain in her shoulders.  (206).  Plaintiff further indicated that her medications were not helpful, and in response Kirdani-Ryan prescribed Tramadol.

On February 3, 2004, plaintiff again saw Kirdani-Ryan.  On this occasion, plaintiff complained about her "nerves" and mood. (205).  Kirdani-Ryan prescribed Celexa and

Ambien, and referred plaintiff for further counseling.  On February 18, 2004, plaintiff told Kirdani-Ryan that the Celexa was "mellowing her out," and suggested to Kirdani-Ryan, based primarily on her own self-diagnosis, that she was bi-polar. (204).  Kirdani-Ryan stated that she would change plaintiff's medication to Depakote, "to better treat bipolar disorder if this indeed is what she has." (Id.).

On February 18, 2004, plaintiff told Kirdani-Ryan that she was still having significant pain in her arms and shoulders.  Because of this pain, plaintiff stated, she could only wash dishes for 20 minutes, and could only sit or stand for 20 minutes before needing to change position. (203).  Kirdani-Ryan's examined plaintiff and found decreased grip strength bilaterally, decreased interosseous muscle strength, pain with internal and external rotation, and weakness on abduction bilaterally.  Kirdani-Ryan also noted "significant trapezius spasm bilaterally" and decreased range of motion in the neck. (203).

On March 15, 2004, Joanne M. Bloom, MA/BH Assessment Therapist I ("Bloom"), examined plaintiff regarding complaints of "behavioral problem[s]," "anxiety," "medical problems," "family problems," and "vocational problems." (187).  More specifically, plaintiff stated that she had "outbursts of anger," and that she was "short tempered, impatient, and picky."  Plaintiff indicated that she believed she might suffer from bipolar disorder, because her daughter had been diagnosed with that condition, and she felt that she had "a lot of the same behaviors" as her daughter. (188).  Bloom noted, however, that plaintiff "failed to report symptoms associated with mania or a major depressive episode." (Id.).  Bloom additionally indicated that, while plaintiff's functioning was "impaired by her report of having difficulty controlling her anger," her

"functioning should improve with mental health treatment." (189).  Bloom observed that plaintiff "did not report enough symptoms to meet the full criteria for a specific mood disorder," although she indicated that plaintiff's symptoms should be monitored and that she would benefit from therapy. (191).

On March 16, 2004, Christine Ransom, Ph.D. ("Ransom"), a non-treating consultative examiner, examined plaintiff. (193-96).  Ransom noted that plaintiff had been in therapy for approximately one month for bipolar disorder, had never been psychiatrically hospitalized, and had no prior outpatient treatment.  Ransom indicated that plaintiff was taking Depakote, apparently for suspected bipolar disorder, which had been prescribed by her primary care physician. (193).  Ransom reported that plaintiff did not think the Depakote "was working yet," because she continued to feel short tempered.  Ransom also reported that plaintiff complained of being short tempered and "very impatient," but "denied depression, anxiety, panic attacks, manic symptomatology, thought disorder, cognitive symptoms and deficits." (Id.).  Ransom observed that plaintiff's speech was intelligent and fluent, that her thought processes were coherent and goal-directed with no evidence of hallucinations, delusions or paranoia, that her affect was "mildly tense, mildly pressured," that she was oriented as to person, place, and time, and that her attention and concentration were intact. (194).  Ransom further indicated that plaintiff's recent and remote memory was intact, her cognitive functioning was average, and her insight and judgment were good. (195).  Ransom's Axis I diagnosis was "mild" bipolar disorder, with the following observations:

> This individual can follow and understand simple directions and
> instructions, perform simple, rote tasks, maintain attention and
> concentration for simple tasks and learn simple new tasks.  She can

perform complex tasks.  She will have mild difficulty relating adequately
with others and appropriately dealing with stress due to continued mild
symptomatology of a bipolar disorder.  The results of the present
evaluation appear to be consistent with the claimant's allegations.

(195).

On March 16, 2004, Ramon Medalle, M.D. ("Medalle"), another non-treating

consultative examiner in the area of internal medicine, examined plaintiff. (197-201).

Plaintiff reportedly told Medalle that she was capable of cooking meals, cleaning the

house, doing laundry, shopping for food and clothing, showering and dressing herself,

and taking care of her children. (198).  Medalle's diagnoses were as follows: "Bronchial

asthma"; "diabetes mellitus, type 2, that probably needs to be treated with medications";

"history of bipolar disorder and probable major depression"; "carpal tunnel syndrome,

bilateral, mild"; "history of tendonitis of both wrists"; and "probable musculoligamentous

disorder of the left shoulder." (200-201).  Medalle recommended that plaintiff should

avoid smoke, dust and respiratory irritants, and that she was "mildly limited in repetitive

use of both hands because of bilateral carpal tunnel syndrome and bilateral tendonitis

of the wrists." (201).  Medalle concluded that plaintiff was "mildly limited" in repetitive

use of both upper extremities. (Id.).

On March 17, 2004, plaintiff told Kirdani-Ryan that she was continuing to have

pain, and consequently could not "do a lot of anything," and had to stop after 20

minutes of any kind of activity, such as scrubbing a bathtub. (202).

On March 25, 2004, Kirdani-Ryan referred plaintiff to Darrick J. Alaimo, M.D.

("Alaimo"), for a neuromuscular consultation and EMG testing.  Alaimo reported the

following findings to Kirdani-Ryan:

> IMPRESSION: Bilateral CTS.  By EMG testing, at this point she has mild bilateral CTS.  She was having difficulty tolerating her wrist splints that she had tried previously, although these were not customized splints.  I think at this point we will go ahead and try her on a course of customized neutral wrist splints bilaterally, and hopefully she will have improvement in symptoms.  If she is having continued problems with pain, you could also change her naproxen to an alternative NSAID, but I will leave this to your discretion.  If she does not improve with conservative measures, then we could consider surgical options, although her EMG findings were quite mild.

(210).

On April 14, 2004, Hillary Tzetzo, M.D. ("Tzetzo"), a non-treating, non-examining agency review physician, examined plaintiff's records and completed a Psychiatric Review Technique form. (215-234).  Tzetzo indicated that plaintiff would have mild restriction in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. (225).  Tzetzo further indicated, in relevant part, that plaintiff

> should be able to understand and follow work directions in a low contact (with the public) work setting, maintain attention for such work tasks, relate adequately to a work supervisor for such work tasks, and use judgment to make work related decisions in a low contact (with the public) work setting now.

(227).

On April 14, 2004, an individual named J. Hartner ("Hartner"), a non-treating, non-examining agency employee, completed a residual functional capacity assessment. (235-240).  Hartner indicated that plaintiff could lift 10 pounds occasionally, lift 10 pounds frequently, and stand, walk, and/or sit for up to 6 hours in an 8-hour workday. (236).  Hartner stated that plaintiff was limited in her ability to push and/or pull, should avoid repetitive movements with her hands, and should also avoid extreme cold and

fumes, odors, dusts, gases, and poor ventilation. (238).  Hartner concluded that plaintiff could not return to her previous work, but could perform other unspecified work. (240). However, his RFC form does not indicate that Hartner is a physician, nor does it indicate any other title or qualifications, accordingly the Court does not believe that it is entitled to any weight.

On September 7, 2004, plaintiff told Kirdani-Ryan that she was having carpal tunnel symptoms only "about three days out of the week." (249).  Kirdani-Ryan saw plaintiff on October 26, 2004, and noted that plaintiff was having "mild carpal tunnel symptoms" and pain and muscle spasm in her shoulders. (248).  Plaintiff reported that chiropractic treatment was giving her temporary relief from the shoulder symptoms.

In January 2005 plaintiff began treating with Jaimala Thanik, M.D. ("Thanik"), at the Pain Management Center upon a referral from Kirdani-Ryan.  Thanik issued a report on January 7, 2005, in which she indicated that she was seeing plaintiff for "evaluation and management of her diffuse bilateral neck, shoulder, and arm pain." (269).  At that time plaintiff was complaining of "diffuse discomfort involving posterior neck, . . . both shoulders, and scapular area," and stated that the symptoms were "worsened by prolonged sitting, sweeping, lifting, or just being too active." (Id.).  Upon examination, Thanik observed that plaintiff's movements were normal and that there was "no sensory or motor deficit in the upper extremities."  However, Thanik found that "[t]here was tenderness and trigger points palpable bilaterally over the trapezius, rhomboid, levator scapulae, and periscapular muscles," as well as mild tenderness in the cervical facet joints bilaterally. (270).  Thanik's impression was "[d]iffuse shoulder and scapular pain which appears to be myofascial syndrome," which should be

12

"managed by a multidisciplinary pain management program." (Id.).

On January 26, 2005, Kirdani-Ryan examined plaintiff again.  On that date, plaintiff stated that she was in pain, and having muscle cramps "from elbows up to neck." (242).  Plaintiff further indicated that she was having "knots" in her shoulders, and was experiencing "pain increased with activity especially scrubbing and housecleaning." (Id.).  Upon examination, Kirdani-Ryan observed "significant trapezius spasm," slightly decreased range of motion in plaintiff's neck, and slightly decreased grip strength. (Id.).

On March 7, 2005, plaintiff returned to Kirdani-Ryan.  Kirdani-Ryan noted that plaintiff had received "trigger point injections," apparently in her shoulders, which had given only temporary improvement (241), and reported that examination showed slightly decreased grip strength bilaterally, positive Phalen's sign, and negative Tinel's sign. (Id.).

On May 25, 2005, Kirdani-Ryan stated that plaintiff had stopped treating with Dr. Thanik because she had reached maximum medical improvement "as far as [her] shoulders [were] concerned." (281).  Kirdani-Ryan also noted that plaintiff's pain was "made worse with activity and with sitting too long." (Id.).

On July 8, 2005, approximately one week prior to the administrative hearing before the ALJ in this matter, Kirdani-Ryan completed an RFC assessment. (271-274).  Kirdani-Ryan described plaintiff's condition as follows: "Patient with persistent marked muscle spasm, awaiting [appointment] for cervical MRI from carrier.  Has failed epidural injection." (272).  Kirdani-Ryan stated that plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, and could sit, stand, and/or walk without limitation.

13

(271-272).  Kirdani-Ryan further indicated that plaintiff was limited in her ability to push and/or pull. (272).  Kirdani-Ryan reported that plaintiff was limited with regard to reaching, handling, fingering, and feeling, and that plaintiff should never reach but could handle, finger, and feel occasionally. (273).  Kirdani-Ryan also indicated that plaintiff had no postural limitations.

Subsequent to the administrative hearing in this matter and the ALJ's determination, plaintiff's counsel forwarded additional medical evidence to the Appeals Council.  This evidence showed that Galaa M. Agban, M.D. ("Agban"), a surgeon, examined plaintiff on August 22, 2005, because of plaintiff's complaints of numbness and pain in her hands.  Agban's examination showed a positive Tinel's and Phalen's sign bilaterally, and tenderness.  Agban stated that plaintiff was not working, but that it was not because of her hands, but rather, because of her shoulder pain. (303).  Agban requested "repeat nerve conduction studies."  On September 12, 2005, Agban indicated that plaintiff's "Phalen muscle [was] getting a little bit weaker only over a period of weeks," and recommended that plaintiff have surgery on her left wrist to relieve the carpal tunnel symptoms. (304).

MRI testing was performed on September 14, 2005, on plaintiff's shoulders and cervical spine. (307-311).  The MRI of plaintiff's cervical spine was normal. (311).  The MRI of the right shoulder revealed "loose bodies" in the shoulder joint, hypertrophic biceps tendinosis, biceps tenosynovitis, moderate supraspinatus tendinosis and fluid signal of mild subacromial/subdeltoid bursitis, no rotator cuff tear, and degenerative changes at the AC joint. (307-308).  The MRI of the left shoulder revealed "mild biceps tendinosis and findings consistent with tenosynovitis, no rotator cuff, minimal

14

supraspinatous tendinosis, and nonspecific changes involving distal clavical, distal acromion, and AC joint which [were] felt to be degenerative." (310).

STANDARDS OF LAW

_____42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above,

15

the Commissioner may carry her burden by resorting to the Medical Vocational

Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v.*

*Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting

that in the grids, "the only impairment-caused limitations considered in each rule are

exertional limitations.")  However, if a claimant has nonexertional impairments which

"significantly limit the range of work permitted by his exertional limitations," then the

Commissioner cannot rely upon the grids, and instead "must introduce the testimony of

a vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain or perform."[2] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. §

416.969a(d).[3]

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other

---

[2]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[3]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

substantial evidence in the record conflicts with the treating physician's opinion . . . that

opinion will not be deemed controlling.   And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states

in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence.  By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2)
> through (6) and 404.1513(b) (1), (4), and (5) and (e). These include
> statements or reports from you, your treating or examining physician or
> psychologist, and others about your medical history, diagnosis, prescribed
> treatment, daily activities, efforts to work, and any other evidence showing
> how your impairment(s) and any related symptoms affect your ability to
> work. We will consider all of your statements about your symptoms, such
> as pain, and any description you, your physician, your psychologist, or
> other persons may provide about how the symptoms affect your activities
> of daily living and your ability to work.
> ***
> In evaluating the intensity and persistence of your symptoms, including
> pain, we will consider all of the available evidence, including your medical
> history, the medical signs and laboratory findings and statements about
> how your symptoms affect you. (Section 404.1527 explains how we
> consider opinions of your treating source and other medical opinions on
> the existence and severity of your symptoms, such as pain.) We will then
> determine the extent to which your alleged functional limitations and
> restrictions due to pain or other symptoms can reasonably be accepted as
> consistent with the medical signs and laboratory findings and other
> evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).  The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).


THE ALJ'S DECISION

At the hearing before the ALJ, plaintiff testified that she was 34 years old and had completed the 11th grade. (32).  She indicated that she was single and lived with her two children, ages 14 and 4.  Plaintiff also indicated that she smoked approximately ten cigarettes per day. (37).  She testified that she held a driver's license and drove approximately 8 miles per week, usually to visit a doctor, but that she did not like to drive because it was painful for her to turn her head. (45).  Plaintiff said that her symptoms of pain, in her hands and shoulders, had not improved, despite the fact that she was no longer working. (39).  For example, she testified that eight cortisone shots in her shoulders had not relieved her muscle spasms. (Id.).  As far as other medications, plaintiff indicated that she had tried a TENS unit, analgesic cream, Naprosyn, Cycloben, Depakote, Synbalta, and Nabumetone. (41).  Plaintiff stated that she felt "constantly sleepy, drowsy," due to her medications. (47).  She also testified that she continued to go to physical therapy once a month. (48).  As for her mental health, plaintiff stated that

18

she had stopped going to therapy, and that her alleged mental impairments were "not a major problem." (52).

Regarding her activities of daily living, plaintiff testified that she needed to use both hands to lift a gallon of milk, and that she was unable to lift her four-year-old child. (45, 54).  She also stated that she needed her teen-aged daughter's help to do the household chores and shopping. (Id.).  Plaintiff said that she had difficulty sleeping, and usually only slept for three to four hours before waking up due to pain and/or discomfort. (46).  She stated that she spent her days reading, attending to her children, and visiting friends and/or relatives.

Following plaintiff's testimony, the ALJ took testimony from a vocational expert ("VE").  In that regard, the ALJ posed a hypothetical question, in which he asked the VE to assume a younger individual with a limited education, who was limited to sedentary work, who could lift 10 pounds occasionally, with no ability to reach, but with the ability to handle, finger, and feel occasionally, and with no limitation on the ability to sit or stand. Based upon the plaintiff's testimony concerning her mental condition, the ALJ did not ask the VE to consider any non-exertional mental impairments.  In response, the VE indicated that such a person could not perform plaintiff's past relevant work (57), but could meet the requirements of another position, surveillance system monitor, DOT code 379.367-010, an unskilled sedentary position. (58).  According to the VE, there are 188,540 of these positions in the national economy, and 533 of them in the local economy. (Id.).  The VE testified that the position required "negligible lifting, less than a pound," occasional use of the hands to push a button, and "less than occasional" writing. (58).  The ALJ then asked the VE to further consider that the hypothetical claimant had

pain to the extent testified to by plaintiff, and that such pain caused her to be unable to

"stay on task one-third to two thirds of the day," to which the VE responded that there

would be no job that such a claimant could perform. (58).

At already, mentioned, the ALJ subsequently issued a decision denying benefits.

At the first step of the five-step sequential analysis described above, the ALJ found that

plaintiff was not engaged in substantial gainful employment. (12).  At the second step of

the analysis, the ALJ found that plaintiff had the following severe impairments: bilateral

carpal tunnel syndrome, bipolar disorder, diabetes mellitus, obesity, and asthma. (12-

13).  Significantly, the ALJ did not include plaintiff's shoulder condition as an impairment,

although he did refer to plaintiff's shoulder pain elsewhere in his decision. (15).  At the

third step of the sequential analysis, the ALJ found that plaintiff's "severe impairments"

did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R.

Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925, and 416.926). (13-14).

At the fourth step of the analysis, the ALJ made the following RFC determination:

> The claimant can perform the exertional requirements of sedentary work or
> work which is generally performed while sitting and does not require lifting
> in excess of ten pounds; the claimant may not be required to reach
> overhead; the claimant may handle, finger, and feel on no more than an
> occasional basis; the claimant may perform all postural movements with
> the exception that she may never climb; the claimant should have no
> exposure to unprotected heights, dangerous moving machinery, or other
> workplace hazards.

(14, 16).  Based upon this RFC, the ALJ concluded that plaintiff could not perform her

past relevant work.

However, the ALJ concluded, at the fifth step of the sequential analysis, that

plaintiff could perform the job of surveillance system monitor, identified by the VE.

Consequently, the ALJ concluded that plaintiff was not disabled.

ANALYSIS

Plaintiff's first argument is that the ALJ failed to give controlling weight to the

opinions of plaintiff's treating physician, Dr. Kirdani-Ryan.  This contention is only

partially true, however.  In fact, the ALJ adopted Kirdani-Ryan's opinions expressed in

the RFC assessment dated July 8, 2005, issued just prior to the disability hearing in this

case. (15)(Adopting the opinion of Dr. Kirdani-Ryan).  And, as plaintiff's counsel

admitted during oral argument, that RFC assessment did not establish that plaintiff was

completely incapable of working, but instead, indicated that plaintiff was restricted to

sedentary work. (271-274).  Plaintiff's objection, really, is that the ALJ did not give

controlling weight to other opinions of Kirdani-Ryan, made in submissions to the New

York State Worker's Compensation Board, in which she opined that plaintiff was "totally

disabled." (*See, e.g.*, Decision of Worker's Compensation Board Legal Appeals Unit, p.

300).  However, the ALJ did not err in that regard, because it is well settled law that an

ALJ need not give controlling weight to a treating physician's opinions concerning a

claimant's "disability" in connection with a Worker's Compensation proceeding. *See,

e.g., Robinson v. Apfel*, No. 97 Civ. 5495(DC), 1998 WL 329273 at *4, n.1 (S.D.N.Y.

Jun. 22, 1998) ("[T]he ALJ properly refused to give controlling weight to Dr. Tambakis's

opinion that plaintiff was disabled . . . for that opinion was given in the context of

plaintiff's worker's compensation claim, which involved a wholly different statutory test.")

(*citing Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir.1984); *Richardson v. Barnhart*, 443

F.Supp.2d 411, 420 n. 5 (W.D.N.Y. 2006) ("[M]any opinions in the record were made for plaintiff's worker's compensation case, and must be considered in that light. For example, an opinion sent to the Worker's Compensation Board that plaintiff is 'totally disabled' likely refers only to total disability from a particular job, and does not consider other work available in the national economy.").

Plaintiff further contends that the ALJ failed to properly consider the opinions of Dr. Alaimo, who performed EMG testing on March 25, 2004.  In that regard, plaintiff asserts that Alaimo indicated that plaintiff's condition had "worsened and that she would require surgery." (Pl. Memo [#9] p. 8).  However, plaintiff is misstating the record.  As to that, while *plaintiff* indicated to Alaimo that her "symptoms [were] gradually worsening with time," Alaimo concluded only that plaintiff had "mild bilateral CTS," and that surgery might be an option if plaintiff did not improve with conservative measures. (210) ("If she does not improve with conservative measures, then we could consider surgical options, *although her EMG findings were quite mild*.") (emphasis added).[4]

Plaintiff additionally contends that the ALJ failed to properly consider plaintiff's neck impairment, and failed to properly evaluate plaintiff's credibility.  For example, plaintiff states that the ALJ "inexplicably failed to even mention plaintiff's neck as a medical condition, even though this was a primary basis for her disability." (Pl. Memo [#9] p. 7).  Moreover, plaintiff alleges that, when evaluating credibility, the ALJ failed to consider plaintiff's long work history, her persistent attempts to obtain treatment, and her

---

[4]On the other hand, subsequent to the hearing before the ALJ, in September 2005, Dr. Agban recommended that plaintiff have surgery to alleviate her carpal tunnel syndrome, which information was submitted to the Appeals Council.  However, the Appeals Council did not comment on this information. On remand the ALJ may consider what, if any, effect this information has on plaintiff's ability to work.

use of medications.  Actually, the ALJ mentioned plaintiff's shoulder condition (15) (Noting that plaintiff had received "a series of eight cortisone injections for relieve pain in her hands and shoulders from tendonitis."), and he may have considered it when he indicated that plaintiff should "not be required to reach overhead." (15).  However, the Court agrees that the ALJ failed to include plaintiff's shoulder condition as an "impairment" during his five-step analysis of her claim, even though it was arguably plaintiff's most limiting medical problem at the time, and failed to discuss it except in passing.  Moreover, the Appeals Council did not comment on the MRI studies of plaintiff's shoulders performed in September 2005.  The Court further agrees that it is unclear whether the ALJ properly evaluated plaintiff's credibility by considering all of the factors listed in 20 C.F.R. § 404.1529.[5]  Consequently, the Court finds that the matter should be remanded for further administrative proceedings.[6]

CONCLUSION

For the reasons discussed above, plaintiff's motion for judgment on the pleadings [#9] is granted, defendant's cross-motion [#11] for the same relief is denied, and this

---

[5]The ALJ stated, in relevant part, only that he had "considered all symptoms in accordance with the requirements of 20 CFR § 404.1529 and 416.929 and Social Security Rulings 96-4p and 96-7p." (14). Thus it is unclear whether the ALJ considered plaintiff's work history or the full extent of her attempts to obtain treatment.  Similarly, it is unclear why the ALJ apparently discounted plaintiff's testimony that her medications made her drowsy. (15).

[6]In her reply memo of law, plaintiff raised, for the first time in this action, the argument that plaintiff should be found disabled if she is able to perform only one occupation, citing *Lounsburry v. Barnhart*, 468 F.3d 1111 (9th Cir. Nov. 7, 2006).  In *Lounsburry*, the Circuit Court found, applying 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.07 and 202.00(c), footnote 2, that the 62-year-old claimant was disabled because she could not perform a "significant range" of occupations. *Id*. at 1117-1118. However, this Court finds that *Lounsburry* is factually inapposite.  For example, the rule that was at issue in *Lounsburry*, referring to "individuals of advanced age," does not apply to plaintiff, who, at age 34, is a "younger individual." 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200.00 ("The term younger individual is used to denote an individual age 18 through 49.").

matter is remanded for further administrative proceedings.

So Ordered.

Dated: Rochester, New York
February 13, 2007

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge